UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MY GOALS SOLUTIONS, INC., et al.<br><br>                    Plaintiffs,<br><br>          -against-<br><br>ZEUS NETWORKS, LLC,<br><br>                    Defendant. | 24-CV-2918-LTS |

<u>Memorandum Opinion and Order</u>

On April 17, 2024, My Goals Solutions, Inc. ("Goals") and NYC Medical Practice IP Holdings Corp. ("NYC Med," and together, "Plaintiffs") initiated this action against Zeus Networks, LLC ("Zeus" or "Defendant") asserting various claims for trademark infringement under the Lanham Act, 15 U.S.C. section 1114(1)(a), and New York common law, trademark dilution under the Lanham Act, 15 U.S.C. section 1125(c), and N.Y. Gen Bus. Law section 360-l, and deceptive trade practices under N.Y. Gen. Bus. Law sections 349 and 350. (Docket entry no. 1 (the "Complaint" or "Compl.").) The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. sections 1331, 1338, and 1367.

On May 21, 2024, Plaintiffs obtained a certificate of default from the Clerk of Court as to Defendant Zeus. (Docket entry no. 9.) Before the Court are Defendant's motions to vacate the entry of default, pursuant to Rule 55(c) of the Federal Rules of Civil Procedure, and for judgment on the pleadings dismissing the Complaint entirely, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket entry no. 22 (the "Motions").) The Court has reviewed the parties' submissions carefully and, for the following reasons, grants Defendant's motion to vacate and grants in part and denies in part the motion for judgment on the pleadings.

<u>Background</u>

The following recitation of material facts is drawn from the Complaint, the well-pleaded factual allegations of which are taken as true for purposes of this motion practice, and from documents integral to the Complaint or otherwise subject to judicial notice.

Goals is a New York-based corporation and plastic surgery practice that does business under the registered trademark of "GOAL AESTHETICS AND PLASTIC SURGERY®" (the "Goals Trademark"). (Compl. ¶ 19.) The Goals Trademark is the property of NYC Med., another New York-based corporation, which licenses it to Goals. (Id. ¶ 20.) Goals also owns the trademarks on its unique procedures, "Double BBL" ("BBL Trademark") and "FLEXSCULPT" ("FLEXSCULPT Trademark"). (Id. ¶ 21.) Dr. Sergey Voskin – a non-party to this action – is a plastic surgeon and the principal of Goals and NYC Med. (Id. ¶ 40.)

Zeus Networks LLC is a web-based television streaming station. (Id. ¶ 6.) On May 1, 2023, Zeus approached Goals with a proposal to have a known reality television personality, Ms. Goldie Martin a/k/a "Rollie Pollie," create a television production of her experience receiving plastic surgeries from Goals. (Id. ¶¶ 22-24.) Defendant purportedly represented that the production would be "entirely positive and would benefit Goals' and Dr. Voskin's reputations by putting them in a positive light," and that such positive exposure would be the sole consideration for the services Goals would provide. (Id. ¶ 25.) Plaintiffs notified Defendant "and Defendants [sic] contractually accepted" the obligation to allow Plaintiffs to review all footage before release to ensure "they were not shown in a negative or demeaning manner" and to protect other patients' confidentiality. (Id. ¶¶ 26-27.) After negotiation, Goals agreed "to allow the filming of their location(s), arranged for two surgeries for Ms. Martin, and allowed a limited use of the three trademarks." (Id. ¶ 28.) The parties exchanged draft

agreements, but no agreement was ever signed among Goals, NYC Med, and Defendant.  (Id. ¶¶ 29-31.)  Although Defendant did not sign Plaintiffs' form agreement before filming began, Plaintiffs agreed to perform the first procedure on May 15, 2023, and the second procedure on July 20, 2023, with the understanding that the "contract would eventually be signed."  (Id. ¶¶ 28-32.)  Following the procedures, Ms. Martin was threatening and abusive to Goals' staff; she engaged in a "campaign of harassment, defamation, . . . accus[ing] Goals, falsely, of killing patients and calling Goals 'death people[.]'"  (Id. ¶¶ 37-38.)

On March 24, 2024, Dr. Voskin became aware that Defendant had created a promotional trailer for the television series, entitled "Transforming Rollie," and "tagged" Goals on its social media.  (Id. ¶ 40.)  Plaintiff alleges that the trailer "regularly used and displayed" Plaintiffs' locations and trademarks and included defamatory comments from Ms. Martin calling staff "unprofessional as f*ck" and remarking, "b*tch, I'll make you lose this whole motherf*cking building, b*tch."  (Id. ¶¶ 40-42.)  Beginning on March 25, 2024, Plaintiffs advised Defendant "multiple times that it [sic] does not authorize them [sic] to use Plaintiffs' locations or trademarks and any implicit right had been revoked."  (Id. ¶ 46.)

On March 26, 2024, Goals brought an action in state court for defamation and other claims, attempting to obtain a preliminary injunction against Defendant to prevent the release of the television program.  See My Goals Solutions, Inc. v. Vimeo.com, Inc., Index No. 152758/2024 (Sup. Ct. N.Y. Cnty. filed Mar. 26, 2024) (the "State Action").  On April 10, 2024, the New York County Supreme Court declined to grant the injunction "on the basis of a release" signed between Defendant and Dr. Voskin.  (Compl. ¶ 48; see also docket entry no. 15-1 ("Appearance Release").)  Defendant published a second video promotion of the program on or

about April 7 or 8, 2024.  (Compl. ¶ 49.)  Plaintiff alleges that the second trailer also utilized Plaintiffs' locations and the three trademarks without authorization.  (Id. ¶ 51.)

Appearance Release

Prior to filming of the series, on May 15, 2023, Dr. Sergey Voskin executed an Appearance Release with Defendant.  The agreement stated, "[f]or good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I hereby grant Zeus Networks, LLC . . . the right to use my name, likeness, voice, conversation, sounds, biographical data and/or material and editorial comments concerning me (collectively, my 'Appearance') in and in connection with the program tentatively entitled "Rollie Pollie Series" ('Program')." (Appearance Release at 1.)  The agreement further included a release of claims, including a provision that

> I expressly waive any and all moral rights I may have in connection with the Materials[1] and/or my appearance. . . . I agree to release, defend, indemnify and hold [Defendant] . . . harmless from any and all claims, demands, costs (including attorneys' fees) and causes of action of any kind or nature whatsoever now and in the future, including without limitation . . . rights of publicity, commercial disparagement, and/or infringement of any other proprietary and/or personal rights arising out of or in connection with my Appearance, statements and/or actions in or creation of the Materials and/or the Program.

(Id.)  The Appearance Release did not include any discussion or mention of either Plaintiff Goals or NYC Med.  (Id.)

---

[1]    "Materials" are defined as "audiovisual, audio-only, visual-only, and literary works, including the production of video and/or audio tapes, photographs, films, and/or recordings of and from my Appearance, including any performance of any musical composition(s)[.]"  (Id.)

Procedural History

Plaintiffs initiated this action on April 17, 2024.  Defendant failed to answer or otherwise appear in the case prior to the Rule 12 deadline for responding to the Complaint and, on May 21, 2024, Plaintiffs obtained a certificate of default.  (Docket entry no. 9.)  On June 13, 2024, Plaintiffs moved for entry of a default judgment but, on the same day, Defendant entered a notice of appearance in the case.  (Docket entry nos. 10, 13.)  On June 17, 2024, Defendant filed its Answer to the Complaint (docket entry no. 15 ("Answer")) and on July 1, 2024, Defendant moved to set aside the entry of default and dismiss the Complaint (Motions).  In its answer to the Complaint, Defendant included a document that was not attached to the Complaint, namely, the Appearance Release, which Defendant heavily relies upon in its motion for judgment on the pleadings.  In connection with the Motions, the Defendant also filed various attorney declarations attaching additional documents that were extraneous to the Complaint.  (Docket entry nos. 24, 25, 26.)  These included the access links to two Transforming Rollie trailers (docket entry no. 25), and documents from the State Action (docket entry no. 26).  On July 8, 2024, Plaintiffs moved to convert Defendant's Rule 12 motion to a motion for summary judgment, pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, because, they asserted, the motion impermissibly raised "matters outside the pleadings."  (Docket entry no. 27.)  On July 10, 2024, Judge Broderick denied Plaintiffs' motion for conversion, finding that the motion for judgment on the pleadings "relies on documents that are either incorporated by reference in, or integral to the complaint."  (Docket entry no. 29 ("Broderick Order").)  On December 4, 2024, this action was transferred to the undersigned.

<u>D<small>ISCUSSION</small></u>

<u>Rule 55(c) Motion</u>

Federal Rule of Civil Procedure 55(a) provides that, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules . . . the clerk shall enter the party's default."  After a default has been entered against a defendant and the defendant fails to appear or move to set aside the default under Rule 55(c), the Court may, on plaintiff's motion, enter a default judgment.  Fed. R. Civ. P. 55(b)(2).  However, it is well established that default judgments are disfavored and there is a strong public policy favoring resolving disputes on the merits.  <u>Pecarsky v. Galaxiworld.com Ltd.</u>, 249 F.3d 167, 172 (2d Cir. 2001).

Rule 55(c) provides that "[t]he court may set aside an entry of default for good cause."  Good cause "should be construed generously."  <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d 90, 96 (2d Cir. 1993).  Indeed, when deciding a motion to vacate a default judgment, "all doubts must be resolved in favor of the party seeking relief from the judgment in order to ensure that to the extent possible, disputes are resolved on their merits."  <u>New York v. Green</u>, 420 F.3d 99, 104 (2d Cir. 2005) (citing <u>Powerserve Int'l, Inc. v. Lavi</u>, 239 F.3d 508, 514 (2d Cir. 2001)).

In determining whether to set aside a defendant's default, the Court should consider three factors: "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented."  <u>Powerserve</u>, 239 F.3d at 514 (internal citation omitted).  The Court may also consider relevant equitable factors, including whether the failure to appear was "a mistake made in good-faith and whether the entry of default would bring about a harsh or unfair result."  <u>Enron Oil Corp.</u>, 10 F.3d at 96.

"When doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party."  Id.

On April 17, 2024, Plaintiffs commenced this action, separate from the state court litigation, to bring the various claims above, which sound in trademark infringement and dilution.  Defendant failed to answer or otherwise appear in the case prior to the Rule 12 deadline for responding to the Complaint and, on May 21, 2024, Plaintiffs obtained a certificate of default. (Docket entry no. 9.)  On June 13, 2024, Plaintiffs moved for entry of a default judgment but, on the same day, Defendant entered a notice of appearance in the case.  On June 17, 2024, Defendant filed its Answer to the Complaint and Defendant moved to set aside the entry of default on July 1, 2024.

Willfulness

The first factor the Court must consider is the willfulness of Defendant's default. Willfulness must amount to "conduct that is more than merely negligent or careless," but must be "egregious or deliberate conduct, such as where [the default was] a strategic decision."  Drywall Tapers & Pointers of Greater N.Y. Loc. Union 1974, IUPAT, AFL-CIO v. Creative Installations, Inc., 343 F.R.D. 358, 364 (S.D.N.Y. 2022).  Here, Defendant claims that its failure to file a timely response was not willful or strategic, but rather was attributable to a mistake in communication from Zeus' registered agent (who was properly served).  As Defendant points out, the Second Circuit has found that a two-month delay in answering caused by a "filing mistake by [a defendant's] in-house counsel's clerk" may be "grossly negligent" but did not cross the line into "willful" behavior.  See Am. All. Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d 57, 61 (2d Cir. 1996).

Despite this explanation, Plaintiffs assert that the decision to default was willful and strategic because Defendant's general counsel was "<u>fully aware</u> of the fact that this matter would devolve into litigation [based on extensive pre-litigation communication and] . . . were fully aware of the relevant issues." (Docket entry no. 30 ("Pl. Mem.") at 3 (emphasis in original).) Plaintiffs' arguments are unpersuasive. While the general possibility of future litigation should have made Defendant vigilant for potential service, this argument merely supports, at best, the conclusion that Defendant's failure to respond was grossly negligent. The general possibility of litigation does not mean that Defendant had <u>actual</u> notice of the initiation of this action, which would be required for the Court to find the default willful.

Therefore, the first factor weighs in favor of vacatur.

<u>Prejudice to Adversary</u>

In the context of a Rule 55 motion, prejudice to a plaintiff must be based on something more than a brief delay in the prosecution of the litigation or the plaintiff's costs and fees incurred in pursuing a default judgment. <u>See</u> <u>Davis v. Musler</u>, 713 F.2d 907, 916 (2d Cir. 1983). Where a plaintiff claims they were prejudiced by a delay, "it must be shown that delay will 'result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'" <u>Id.</u> at 916. Plaintiffs claim that they will be prejudiced by allowing this case to proceed to the merits because delay in the litigation will complicate the discovery process, "given the inherent digital nature of the case. Digital impressions on videos change over time . . . and, in fact, it is likely that the video continues to be published on other video web service mediums, thus leading to additional 'sources' to track down in discovery." (Pl. Mem. at 4.) This argument is insufficient to warrant denial of the motion for vacatur. Although discovery may be complicated slightly by Defendant's late response, Plaintiffs'

rationale is insufficient to show such a serious likelihood of discovery difficulties to justify a finding of prejudice from Defendant's month-long delay.

<u>Meritorious Defenses</u>

Finally, as discussed below, Defendant has potentially meritorious defenses to the claims based on the Appearance Release signed by Dr. Voskin, as well as based on the merits of the specific federal claims.

Therefore, weighing each factor and considering the "strong public policy" in favor of deciding disputes on their merits, the Court finds that the Defendant has shown good cause to vacate the entry of default in this case, and accordingly grants Defendant's Rule 55(c) motion.[2]

<u>Rule 12(c) Motion</u>

The Court next turns to Defendant's motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c).

---

[2]    Defendant appears to request, in the alternative, that the Court deem the answer timely under Rule 6(b)(1)(B), which provides that, "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). The "excusable neglect" standard is more rigorous than that provided by Rule 55(c) and "is appropriate when default judgment or another final order has been entered against the Defendant." <u>Am. Emp. Surplus Lines Ins. Co. v. Concord Restoration Inc.</u>, No. 20-CV-2341, 2021 WL 7830142, at *4 n.11 (E.D.N.Y. July 28, 2021). Given that the Court has found that Defendant has satisfied Rule 55(c)'s "good cause" standard, the Court sees no reason to apply a Rule 6(b)(1)(B) analysis here, where denial would simply mean that Plaintiffs were entitled to move for default. <u>See</u> <u>Packard v. New York</u>, No. 15-CV-7130-AT-SDA, 2018 WL 229123, at *1 (S.D.N.Y. Apr. 30, 2018); <u>Alizada v. Talibov</u>, No. 23-CV-5484-CM-OTW, 2024 WL 3676584, at *5 (S.D.N.Y. Aug. 6, 2024) ("The court deems the time to file an answer extended as a necessary adjunct of granting the motion to vacate and accepts the answer that was filed along with the motion.").

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." Lively v. WAFRA Inv. Adv. Grp., Inc., 6 F.4th 293, 301 (2d Cir. 2021) (internal quotation and citation omitted).  To survive a motion to dismiss for failure to state a claim, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).  In deciding a Rule 12(b)(6) motion to dismiss a complaint, the Court must "draw all reasonable inferences in [p]laintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014) (citation omitted).

At the outset, Plaintiffs again argue that the Court should, under Rule 12(d), convert Defendants' 12(c) motion into a motion for summary judgment, which is required when a motion purportedly filed under 12(c) involves "matters outside the pleadings [that] are presented to and not excluded by the court." Fed. R. Civ. P. 12(d); see also Lively, 6 F.4th at 302.  On July 10, 2024, Judge Broderick denied Plaintiff's letter motion to convert, finding that Defendant's Rule 12(c) motion, which largely relies upon the Appearance Release, "relies on documents that are either incorporated by reference in, or integral to the complaint." (Docket entry no. 29.)  Therefore, the Court finds that the law of the case dictates that the Appearance

Release is properly considered in connection with the instant 12(c) motion.  See United States v.

Aquart, 92 F.4th 77, 93 (2d Cir. 2024) ("The law of the case will be disregarded only when the

court has a clear conviction of error with respect to a point of law on which its previous decision

was predicated." (internal citation omitted)).

Appearance Release

    Defendant, citing the Appearance Release executed on May 15, 2023, by Dr.

Sergey Voskin in favor of Defendant, asserts that it is entitled to judgment on the pleadings as to

all claims.  The agreement stated, "[f]or good and valuable consideration, the receipt and

sufficiency of which is hereby acknowledged, I hereby grant Zeus Networks, LLC . . . the right

to use my name, likeness, voice, conversation, sounds, biographical data and/or material and

editorial comments concerning me (collectively, my 'Appearance') in and in connection with the

program tentatively entitled 'Rollie Pollie Series' ('Program')."  (Appearance Release at 1.)  As

noted above, the agreement further included a release of claims, including a provision that

> I expressly waive any and all moral rights I may have in connection with
> the Materials[3] and/or my appearance. . . . I agree to release, defend,
> indemnify and hold [Defendant] . . . harmless from any and all claims,
> demands, costs (including attorneys' fees) and causes of action of any kind
> or nature whatsoever now and in the future, including without limitation
> . . . rights of publicity, commercial disparagement, and/or infringement of
> any other proprietary and/or personal rights arising out of or in connection
> with my Appearance, statements and/or actions in or creation of the
> Materials and/or the Program.

(Id. at 1.)  Finally, the agreement included a choice of law provision specifying that its terms

would be governed by the laws of California.  (Id.)

---

[3]  "Materials" are defined as "audiovisual, audio-only, visual-only, and literary works,
including the production of video and/or audio tapes, photographs, films, and/or
recordings of and from my Appearance, including any performance of any musical
composition(s)[.]"  (Id.)

Defendant argues that the terms of the Appearance Release unambiguously release the claims Plaintiffs seek to assert against Defendant in this action.  (Def. Mem. at 16-18.)  Plaintiffs point out, however, that the only signatory to the agreement is Dr. Voskin and assert that he did not release Plaintiffs' claims.  (Pl. Mem. at 13-14.)

"The interpretation of a release or settlement agreement is governed by the same principles applicable to any other contractual agreement."  Gen. Motors Corp. v. Superior Ct., 12 Cal. App. 4th 435, 439 (Cal. Ct. App. 1993).  The Appearance Release is entirely written in the first person, Dr. Voskin signed it and printed his own name in the signature block, with no indication of affiliation with any entity or organization, and its release terms described the delineated category of claims only as they pertained to Dr. Voskin himself. [4]  (See generally Appearance Release.)  Indeed, Defendant cites no authority to support its assertion that Dr. Voskin's individual entry into the agreement also released all claims accruing to Plaintiffs.  (See generally Def. Mem.)

Instead, Defendant advances an alter-ego theory, an approach that allows a Court to pierce the corporate veil when a corporation and an individual are so intertwined as to be legally indistinguishable. [5]  See Americore Drilling & Cutting, Inc. v. EMB Contracting Corp.,

---

[4]     As the name suggests, the Appearance Release is primarily concerned with personal rights owned by Dr. Voskin for the depiction of his "name, likeness, voice, conversation, sounds, biographical data and/or material, and editorial comments concerning [him] (collectively, [his] 'Appearance')."  (Appearance Release.)  By providing Zeus with the right to use his personal and individual Appearance, Dr. Voskin clearly provided consideration separate from any of the consideration Goals provided, contrary to Defendant's assertions.  (See Def. Mem. at 17 (arguing that only Goals provided consideration in return for Zeus' promises to allow Goals and Voskin to review all footage of the show (citing Compl. ¶¶ 27-28)).)

[5]     The parties brief the issues pertaining to the Appearance Release using both California and New York state law.  (See Def. Mem. at 16-18; Pl. Mem. at 13-14.)  The contract's

156 N.Y.S.3d 355, 362 (N.Y. App. Div., 2d Dep't 2021) ("[T]he corporate veil will be pierced to achieve equity, even absent fraud, when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego[.]" (internal citations omitted)). So-called "reverse piercing" allows courts to disregard the corporate form "whenever necessary to prevent fraud or to achieve equity," by holding a corporation liable for the actions of its owners.  State v. Easton, 647 N.Y.S.2d 904, 909 (N.Y. Sup. Ct. Albany Cnty. 1995) (internal citations omitted).  The key consideration for such veil-piercing analyses is whether Voskin exercised "[c]omplete domination of the corporation" and whether he used Goals or NYC Med as "mere device[s] to further [his] personal rather than legitimate corporate interests."  Id.

Defendant argues that the Complaint includes allegations sufficient to demonstrate the type of control necessary to support an alter-ego theory of veil piercing, but the allegations Defendant cites do not suggest the unity of interests necessary to find the requisite domination.  Defendant contends that the Complaint shows the necessary unit of interest because the Complaint conflates the consideration received by Dr. Voskin with the consideration received by Goals to enter into their respective agreements with Defendant.  (Def. Mem. at 16 (citing Compl. ¶¶ 25-28).)  This argument is unpersuasive.  The allegations of the Complaint support a plausible inference that both Goals and Voskin agreed to participate in the Transforming Rollie

---

choice of law provision dictates that California law applies to the terms of the Appearance Release.  Because both Plaintiff corporations were incorporated under the laws of the state of New York, the Court applies New York state law to analyze the corporate structure of the Plaintiffs with respect to Dr. Voskin.  CBF Industria De Gusa S/A v. AMCI Holdings, Inc., 650 F. Supp. 3d 228, 249 (S.D.N.Y. 2023) (Under federal choice-of-law analysis, "certainty, predictability and uniformity of result . . . favor applying the law of the place of incorporation, unless some other jurisdiction has a stronger interest.").

project for their own separate consideration in the form of the promised favorable publicity:

Voskin, through his personal appearance and the portrayal of his professional work product on

the program, and Goals through the display of its premises and expected positive portrayal of its

business.  (See Compl. ¶ 25.)  Furthermore, the Complaint contains allegations that support a

plausible inference that Plaintiffs and Dr. Voskin respected the separation of their respective

personal and corporate interests.  The Complaint does allege that Dr. Voskin is the principal of

both Plaintiffs.  (Id. ¶ 40.)  The Complaint goes on, however, to describe Dr. Voskin and

Plaintiffs as legally distinct actors throughout the contracting negotiations (see id. ¶¶ 25, 27, 48)

and alleges that Goals did not have a signed agreement with Defendant, asserting that the state

court incorrectly conflated Dr. Voskin "as shareholder with the Goals corporation" (id. ¶ 48).

Underlying this conclusory assertion are additional factual allegations that the three trademarks

were held separately and licensed between Goals and NYC Med., which supports an inference

that Dr. Voskin respected the separation of the business entities' interests.  (Id. ¶¶ 20-21.)

Additionally, as noted above, the Appearance Release refers solely to the signatory (Dr. Voskin)

in his personal capacity and fails to reference either business in any capacity.  (Appearance

Release.)

        Defendant next argues that the Court should find Plaintiffs to be the alter-egos of

Voskin based on taking "judicial notice" of the proceedings in the New York State Court action,

My Goals Solutions, Inc. v. Vimeo.com, Inc., Index No. 152758/2024 (Sup. Ct., N.Y. Cnty. filed

Mar. 26, 2024), in which several of the same persons who are parties to this action were litigants.

(Def. Mem. at 17; see also docket entry no. 26 ("Rickershauser Decl.") (attaching relevant case

materials).)  Specifically, Defendant cites Justice Louis L. Nock's order denying a request by Dr.

Voskin and Goals for a temporary restraining order on the basis of findings that "serious issues

arise" as to the merits of plaintiffs' defamation and contract claims because of what he characterized as the "broad-stroked language" of the Appearance Release (see Rickershauser Decl. Ex. D ("Justice Nock Ord.") at 4). While this Court may take judicial notice of the record in the related state court litigation, it is not bound by that court's determinations.

       In any event, the Court finds Defendant's argument unpersuasive. Justice Nock – reviewing the allegations of the complaint that was before him – found that the complaint referred to an "agreement" regarding Goals' decision to provide the plastic surgery services to Ms. Martin and that, absent any allegations of a separate agreement between Goals and defendants, the "obvious reference to an agreement in said regard is to [Voskin's] Appearance Release." (Id.) In the Complaint before this Court, this connection is not so clear. The Complaint alleges that Defendant engaged in negotiations with Goals to finalize an agreement pertaining to the television production but that no written agreement was ever signed and filming commenced only due to "certain verbal promises made" and "tacit[]" understandings that "the contract would eventually be signed." (Compl. ¶¶ 29-31.) Indeed, accepting all factual allegations as true, and drawing all plausible inferences in Plaintiffs' favor, the Complaint sufficiently alleges that Plaintiffs engaged in negotiations with Defendant to provide certain services for valuable consideration separate from that received by Dr. Voskin, that the parties made verbal promises and representations prior to providing those services, and that Plaintiffs were not party to any signed, written agreement, including the Appearance Release, prior to providing those services. (Id. ¶¶ 2, 29-31, 48.) Therefore, at the pleading stage, the Court finds that the Complaint's references to Goals' "agreements" to preliminarily allow the use of its trademarks and location for filming do not support an inference that Goals' claims in this action are precluded by the Appearance Release. (Id. ¶¶ 29-31.)

Given the standard applicable on a Rule 12(c) motion, the Appearance Release does not warrant the dismissal of Plaintiffs' claims at the pleading stage.

Trademark Infringement

Counts I and II assert trademark infringement claims for Defendant's unauthorized use of Plaintiffs' registered trademarks under the Lanham Act and New York state common law, respectively.  To state a claim under the Lanham Act, Plaintiffs must allege that: (1) they had a valid mark entitled to protection, (2) the Defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods and services, (5) without Plaintiffs' consent.  1-800 Contacts, Inc. v. WhenUCom, Inc., 414 F.3d 400, 406 (2d Cir. 2005). These requirements are the same under New York state common law, and the infringement claims should therefore be analyzed together.  See Tiffany (N.J.) Inc. v. eBay Inc., 600 F.3d 93, 101 n.6 (2d Cir. 2010).  Plaintiffs have alleged that all three trademarks at issue are federally registered.  (Compl. ¶ 58.)  Registration constitutes "prima facie evidence that the mark is . . . protectable." Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 37 (2d Cir. 2016). Finally, trademark infringement claims under both the Lanham Act and New York law must be supported by a showing that the use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the goods (or services). Id.; Beverage Mktg. USA v. S. Beach Beverage Co., Inc., 799 N.Y.S.2d 242, 244 (App Div., 2d Dep't 2005).  The likelihood-of-confusion prong turns on the question of whether "ordinary consumers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [misused] mark." Guthrie, 826 F.3d at 37.  "Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification." Star Ind., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 384 (2d Cir. 2005) (citation omitted).  "The

public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." Id. (citation omitted).

Plaintiffs have alleged that Defendant used the mark "throughout" the promotional videos and advertising for the Transforming Rollie program (Compl. ¶ 42), that it did so without explicit permission from Plaintiffs, and that any implicit permissions had been revoked (id. ¶¶ 46, 61). The Complaint, however, incorporates by reference the two promotional videos, the content of which contradict Plaintiffs' allegations of pervasive unauthorized use of trademarks. (See docket entry no. 25 ("Tolbert Decl.") at Ex. 1, 2.) The only trademark portrayed in the videos is the "Goals®" trademark, which, from the Court's review, is visible for fractions of a second in two frames of one video.[6] (Docket entry no. 25-1.) Where documents incorporated by reference into the complaint contradict the complaint's allegations, "the documents control" and the Court need not accept the complaint's misstatements as true. Rappaport v. Asia Electronics Holding Co., Inc., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

Defendant argues that the Complaint fails to state a claim because the fleeting use of the Goals Trademark is insufficient to cause confusion as to the sponsorship or affiliation of Plaintiffs with the Transforming Rollie advertising and series. (Def. Mem. at 23.) "[W]here it would be difficult for even a keen observer to pick out the allegedly infringed mark, a plaintiff cannot plausibly establish that ordinarily prudent consumers would be confused as to the sponsorship or affiliation and his trademark claims would fall short." Gayle v. Home Box Off., Inc., No. 17-CV-5867-JMF, 2018 WL 2059657 (S.D.N.Y. May 1, 2018) (finding no likelihood of

---

[6]     Plaintiffs argue, in this motion practice, that the Trademarks are also used multiple times in the full Transforming Rollie video series that is now available on Vimeo. (Pl. Mem. at 15.) As discussed below, these allegations are not included in the Complaint, and the Complaint cannot be amended through an opposition brief. The Court therefore cannot consider these improperly proffered allegations in connection with this motion practice.

confusion where plaintiff's claims were "premised on a fleeting shot of barely visible graffiti painted on what appears to be a dumpster in the background of a single scene"); see also Gottlieb Dev. LLC v. Paramount Pic. Corp., 590 F. Supp. 2d 625 (S.D.N.Y. 2008) (finding implausible the assertion that the appearance of plaintiff's trademarked pinball machine in the defendant's film for fractions of a frame lasting "approximately three seconds each" would confuse ordinarily prudent consumers as to the sponsorship or affiliation); (see also Def. Mem. at 24 (citing foregoing cases).)

The Court, however, finds Defendant's proffered cases to be inapposite given the full scope of Plaintiffs' allegations.  In the cases Defendant cites, courts found a de minimis depiction of a trademark in a film or series otherwise unassociated with the subject of the art to be too minimal to give rise to a "serious possibility" of confusion.  See Gottlieb, 590 F. Supp. 2d at 630-35 (finding no plausible likelihood of confusion where the fleeting appearance of plaintiff's pinball machines was "never mentioned and play[ed] no role in the plot" of defendant's two hour long romantic comedy).  Given that the provision of Goals' plastic surgery services is the core subject matter of the Transforming Rollie series, the videos' display of the surgical procedures, employees, and premises of Plaintiffs, the fact that Defendant posted the series' promotional trailer and tagged Goals (see Compl. ¶¶ 40-43; Tolbert Decl. at Ex. 1, 2.), and the context and circumstances of the videos support a plausible inference that even the short depiction of the Goals Trademark could be sufficient to create confusion as to Plaintiffs' affiliation with the video series.[7]  See Star Ind., 412 F.3d at 383-84.

---

[7]    Plaintiffs also plausibly allege that the appearance of this affiliation would be misleading. Although Plaintiffs allege that they did agree to provide the services and allow filming, they also allege that they had stipulated, as a term of their involvement, the right to review the videos to ensure confidentiality and to ensure that the businesses were

Therefore, the Court finds that these allegations support a plausible inference that the depiction of the Goals Trademark in the promotional videos for the program is sufficiently likely to cause confusion as to Plaintiffs' affiliation with the final Transforming Rollie series. Defendant's motion is denied with respect to Counts I and II.

<u>Federal Trademark Dilution</u>

Count IV asserts a trademark dilution claims under Section 43(c) of the Lanham Act. Section 43(c) provides that the owner of a "famous," "distinctive" mark is entitled to an injunction against the user of a mark that is "likely to cause dilution" of the famous mark. 15 U.S.C.A. § 1125(c) (Westlaw through P.L. 119-4). A mark is considered famous if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." <u>Id.</u> § 1125(c)(2)(A). "Courts in this district have consistently construed the fame requirement to impose a heavy burden on parties seeking to assert a trademark dilution claim." <u>Nat'l Debt Relief, LLC v. Season 4, LLC</u>, No. 23-CV-07198-LAK-KHP, 2024 WL 2941397, at *3 (S.D.N.Y. May 20, 2024), <u>report and recommendation adopted</u>, No. 23-CV-7198-LAK, 2024 WL 3105706 (S.D.N.Y. June 24, 2024) (citation omitted). "Only trademarks that enjoy such broad renown so as to at least approach (if not attain) the status of 'household names' may qualify as famous marks under federal law." <u>Schutte Bagclosures Inc. v. Kwik Lok Corp.</u>, 193 F. Supp. 3d 245, 283 (S.D.N.Y. 2016), <u>aff'd</u>, 699 F. App'x 93 (2d Cir. 2017).

---

portrayed in a positive light. (Compl. ¶¶ 26-27.) Defendant allegedly did not provide Plaintiffs with that opportunity. (<u>Id.</u> ¶¶ 44-45.) Therefore, the implication that Plaintiffs had provided permission and approved the use of their Trademark in the final Transforming Rollie series would be erroneous.

The Complaint contains few factual allegations relevant to this analysis. Plaintiffs allege that "[t]he Trademarks have gained widespread publicity and public recognition, especially in the plastic surgery industry, in New York and elsewhere." (Compl. ¶ 87.) These conclusory allegations of the Trademarks' fame in a specific geographic region and industry, by themselves, are insufficient for to plead plausibly the element of distinctiveness under the Lanham Act, which requires renown among the general public.[8] See Schutte Bagclosures, 193 F. Supp. 3d at 283 ("[N]iche fame among a specific marketplace or group of consumers is insufficient" to qualify as famous under the Lanham Act).

Therefore, the Court finds that Plaintiffs have failed to state claim for trademark dilution under the Lanham Act because the factual allegations of the Complaint do not support a plausible inference that the trademarks reached the level of fame to be entitled to federal protection against dilution. Defendant is entitled to judgment dismissing Plaintiffs' Section 43(c) claims (Count IV).

State Trademark Dilution

Count III asserts a trademark dilution claim under New York General Business Law section 360-l. The New York General Business Law provides a cause of action for injunctive relief if there is a "likelihood of injury to business reputation or of dilution of the

---

[8]    Plaintiffs also argue, in submissions in this motion practice, that the Goals business and associated trademarks have garnered a widespread, international following. (Pl. Mem. at 19.) Setting aside the sufficiency of these factual allegations to support an inference of the fame required to state a dilution claim under the Lanham Act, "new facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered in deciding a motion to dismiss." Logfret, Inc. v. Gerber Fin., Inc., 559 F. Supp. 3d 348, 361 (S.D.N.Y. 2021) (internal quotation marks and citation omitted); see also O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.").

distinctive quality of a mark or trade name . . . in cases of infringement of a mark registered . . . ,

notwithstanding the absence of competition between the parties or the absence of confusion as to

the source of goods or services."  N.Y. Gen. Bus. § 360-l (Westlaw through L.2025).  New York

law does not require a mark to be famous for the availability of such relief.  See Tiffany (NJ),

600 F.3d at 111 (comparing New York and federal anti-dilution law).  To state a claim, Plaintiffs

need only allege "(1) a distinctive mark capable of being diluted and (2) a likelihood of dilution."

Akiro LLC v. House of Cheatham, Inc., 946 F. Supp. 2d 324, 342 (S.D.N.Y. 2013).  Dilution can

fall under two theories; Plaintiffs primarily advance a theory of dilution by tarnishment, which

may be shown when a trademark "is linked to products of shoddy quality, or is portrayed in an

unwholesome or unsavory context, with the result that the public will associate the lack of

quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods."

Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 110 (2d Cir. 2009).  "Some cases

have found that a mark is tarnished when its likeness is placed in the context of sexual activity,

obscenity, or illegal activity."  Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 507

(2d Cir. 1996) (collecting cases).

   Drawing all inferences in Plaintiffs' favor, Plaintiffs have alleged that their mark

is a distinctive signifier of their business and that its use in the Transforming Rollie trailers,

alongside unflattering depictions of the quality of Plaintiffs' services, explicit language, and crass

behavior, shows that Plaintiffs' trademark was portrayed in an unwholesome or unsavory context

that may tarnish the mark's reputation.  Defendant's motion is therefore denied with respect to

Count III.

Deceptive Business Practices Claims

Count V asserts claims for deceptive trade practices and false advertising in violation of New York General Business Law sections 349 and 350.  Under Section 349, a plaintiff must show (1) that the defendant's deceptive acts were directed at consumers, (2) that the acts were misleading in a material way, (3) that the plaintiff has been injured as a result. Poller v. BioScrip, Inc., 974 F. Supp. 2d 224, 237-38 (S.D.N.Y. 2013).  Section 350 requires a plaintiff to allege the same elements in addition to allegations that the defendant's misleading acts involved false advertisements.  Duran v. Henkel of Am., Inc., 450 F. Supp. 3d 337, 346-47 (S.D.N.Y. 2020).  The "gravamen" of a deceptive trade practices claim under the New York General Business Law must be "consumer injury or harm to the public interest."  Securiton Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995) (citation omitted).  A corporation may have standing to sue "so long as some harm to the public at large is at issue."  Id.  "[C]ourts have interpreted [§ 349's] scope as limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety."  Sports Traveler, Inc. v. Advance Mag. Publishers, Inc., No. 96-CV-5150-JFK, 1997 WL 137443, at *2 (S.D.N.Y. Mar. 24, 1997).  "Accordingly, many courts have found that mere evidence of consumer confusion is not enough to satisfy this element."  LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 679 (S.D.N.Y. 2016) (collecting cases).

The Court finds that Plaintiffs have not alleged the requisite level of harm to the public at large to sustain a claim under sections 349 or 350.  The crux of Plaintiffs' Complaint is the negative portrayal and association of their business with the unflattering content in the Transforming Rollie trailers.  While that harm may affect the Goals business very significantly, it

is not the sort of public harm that is contemplated by the New York General Business Law. Defendant's motion is therefore granted with respect to Count V.

<u>LEAVE TO FILE A MOTION TO AMEND</u>

Rule 15(a) provides that a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). There is a particularly strong preference for allowing amendment when "the plaintiff has not had the benefit of a court ruling with respect to the deficiencies of its pleading." <u>Allianz Glob. Invs. GmbH v. Bank of Am. Corp.</u>, 473 F. Supp. 3d 361, 365 (S.D.N.Y. 2020); <u>see also</u> <u>Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC</u>, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."). Because this is the first time the Court has put Plaintiffs on notice with respect to the deficiencies of their claims, Plaintiffs are granted leave to file a motion to amend the Complaint to replead Counts IV and V, **within 21 days of the entry of this Memorandum Opinion and Order**. Any such motion must comply with the applicable federal and local rules of motion practice. Should Plaintiffs fail to file a motion for leave to amend within 21 days of the entry of this Memorandum Order, Plaintiffs' federal trademark dilution and New York deceptive trade acts and false advertising claims will be dismissed with prejudice and without further advance notice.

<u>CONCLUSION</u>

For the foregoing reasons, the Defendant's motion to vacate the entry of default is granted. Defendant's motion for judgment on the pleadings is denied with respect to Plaintiffs' trademark infringement claims under the Lanham Act (Count I) and trademark infringement and

dilution claims under New York law (Counts II and III).  Defendant's motion is granted with

respect to Plaintiffs' remaining Counts asserting claims for trademark dilution under the Lanham

Act (Count IV) and deceptive trade acts and false advertising under the New York General

Business Law (Count V).  Plaintiffs are granted leave to make a motion to amend the Complaint

**within 21 days of the entry of this Memorandum Opinion and Order** to correct the

deficiencies in their claims identified herein.  Should Plaintiffs fail to file a timely motion for

leave to amend these claims, they will be dismissed with prejudice and without further notice.

This action will be referred to Magistrate Judge Stein for general pretrial

management.  This Memorandum Order resolves docket entry no. 22.

SO ORDERED.

Dated: New York, New York
      March 28, 2025

                                   /s/ Laura Taylor Swain
                                  LAURA TAYLOR SWAIN
                                  Chief United States District Judge